**CARNEY BATES & PULLIAM, PLLC**
Joseph H. "Hank" Bates
hbates@cbplaw.com
2800 Cantrell Rd., Suite 510
Little Rock, Arkansas 72202
Telephone:   (501) 312-8500
Facsimile:   (501) 312-8505

**KU & MUSSMAN, P.A.**
Brian T. Ku
brian@kumussman.com
Louis I. Mussman
louis@kumussman.com
M. Ryan Casey
ryan@kumussman.com
6001 NW 153rd St., Suite 100
Miami Lakes, Florida 33014
Telephone:   (305) 891-1322
Facsimile:   (305) 891-4512

**MILSTEIN ADELMAN, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@milsteinadelman.com
Sara D. Avila, State Bar No. 263213
savila@milsteinadelman.com
2800 Donald Douglas Loop North
Santa Monica, California 90405
Telephone:   (310) 396-9600
Fax:   (310) 396-9635

*Attorneys for Plaintiff,*
*Paul Jensen and the Class*

## UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL JENSEN, individually and on behalf of all others situated;<br><br>   Plaintiff,<br>  vs.<br><br><br>CABLEVISION SYSTEMS CORPORATION, a Delaware Corporation, and DOES 1 through 100, inclusive,<br><br>   Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Paul Jensen ("Plaintiff"), individually and on behalf of all others similarly situated, brings this complaint against Cablevision Systems Corporation ("Defendant," the "Company," or "Cablevision").  Plaintiff seeks certification of this matter as a class action. Plaintiff, by and through his counsel, submits this Class Action Complaint (the "Complaint") against Defendant, and allege as follows:

## I.     SUMMARY OF COMPLAINT

1)     As smartphone and tablet technology improves, consumer demand for ways to connect such devices to the Internet grows.  For years, consumers relied on their mobile phone carriers' cellular networks to provide Internet access and data services from any location.  Now, in an effort to compete with mobile carriers, Cablevision seeks to establish an alternative "Wi-Fi" network to which consumers can connect.

2)     Unlike its mobile carrier competitors, Cablevision does not seek to establish national coverage through a series of cellular towers erected at its expense.  Rather, Cablevision seeks to externalize its infrastructure costs to its residential Internet customers by converting the individual wireless routers it leases to those customers into a public Wi-Fi network.  In the past few years, Cablevision quietly began leasing routers to its residential customers that, in addition to supplying a private Wi-Fi network in the customers' home ("Optimum Online Service"), also broadcasts a second, public network ("Optimum Wi-Fi Hotspot"), which anyone may utilize to connect to the Internet.[1]  Such practices enable both Cablevision and unidentified third parties to improperly use Internet services purchased by unsuspecting Cablevision customers, such as Plaintiff and the Class.

3)     Importantly, Cablevision does not obtain the authorization of its customers to share their Internet services with the public at large.  Nor does Cablevision require the unknown third parties logging on to these home routers to obtain the customers' authorization.

---

[1] "Public," however, does not mean "free."  It simply means that access is available to any party who pays to use the Wi-Fi hotspot.  Cablevision allows certain customers to log on to these hotspots as part of their subscription plan; additionally, through an agreement with competing Internet service providers, subscribers of Time Warner, Comcast, Brighthouse, and Cox may also access these residential Wi-Fi hotspots.  Beyond having to pay for access, there are no barriers or selection criteria with regard to who may connect to an Optimum Wi-Fi Hotspot.

4)      Further, Cablevision refuses to allow customers to opt out of broadcasting the Optimum Wi-Fi Hotspot.

5)      Cablevision's unauthorized use of its customers' Internet service is hardly victimless.  First, Cablevision is externalizing its electricity costs onto its customers, as the routers it leases consume more energy as a result of broadcasting the Optimum Wi-Fi Hotspot.  As noted by a marketplace consultant who analyzed the performance of routers that broadcast secondary Wi-Fi networks, such practices "push[] tens of millions of dollars per month of electricity bills needed to run [a] nationwide public Wi-Fi onto consumers."  Second, the presence of an additional Wi-Fi signal degrades the speed of the customers' residential Wi-Fi connection.  Third, the Optimum Wi-Fi Hotspot may be accessed by *any* third party, including malicious actors, and thus poses increased security risks.

6)      Cablevision's actions violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, N.Y. Gen. Bus. Law § 349, and amount to acts of trespass to chattels and unjust enrichment.  Plaintiff seek injunctive and declaratory relief, restitution, and monetary damages, individually and on behalf of (1) a national class of all people in the United States that have subscribed to Cablevision's Optimum Online Service and that, as a result, have leased wireless routers that broadcast an Optimum Wi-Fi Hotspot; and (2) a New York subclass of all people in New York that have subscribed to Cablevision's Optimum Online Service and that, as a result, have leased wireless routers that broadcast an Optimum Wi-Fi Hotspot.

## II.    **JURISDICTION AND VENUE**

7)      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.  This Court also has original jurisdiction over the state law claims under 28 U.S.C. § 1332(d) because the action involves 100 or more class members; at least one member of the proposed class is a citizen of a State different from the State of citizenship of Defendant and the matter in controversy exceeds $5 million in sum or value.

8)      This Court has personal jurisdiction over Defendant because Defendant owns and operates businesses that are headquartered in this District and conducts substantial business

2

throughout New York.

9)      Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant is headquartered in this District.  Further, the acts giving rise to this Complaint were executed in New York, as Defendant's deceptive scheme was designed and implemented in New York.

## III.    PARTIES

10)     Plaintiff Paul Jensen ("Plaintiff") resides in Brooklyn, New York. Plaintiff is a subscriber to the Optimum Online Service, and as a result was provided with a router by Defendant that broadcasts, without Plaintiff's authorization, the secondary Optimum Wi-Fi Hotspot.

11)     Defendant Cablevision Systems Corporation is an American media corporation organized and existing under the laws of the State of Delaware, with its principle place of business located at 1111 Stewart Avenue, Bethpage, NY 11714.   Cablevision provides the Optimum Online Service to residential customers in New York, New Jersey, Connecticut, and Pennsylvania.

## IV.    FACTUAL ALLEGATIONS

### A.    Wi-Fi Internet Connectivity and Cablevision's Network of Optimum Wi-Fi Hotspots

12)     Across the country, hundreds of millions of consumers connect to the Internet every day.  Increasingly, they do so via mobile devices such as smartphones, tablets, and laptop computers, and because these devices are mobile, the manner in which they connect to the Internet must be wireless.  Presently, there are two leading means of wireless Internet connection for mobile devices: cellular networks and Wi-Fi networks.

13)     While cellular providers such as AT&T and Verizon have invested in a network of cellular towers allowing for coverage across the country, there is no corresponding national infrastructure of Wi-Fi networks.  Instead, consumers wishing to connect to Wi-Fi must first find a Wi-Fi network to connect to (via a "Wi-Fi hotspot," a colloquial term for a wireless router that

broadcasts a Wi-Fi signal) and are then bound to stay within the range of that hotspot or else lose their connection.

14) Cablevision has decided to compete with cellular networks for consumers who wish to connect to the Internet on the go.  However, the Company does not have the infrastructure for a cellular network (namely, cellular towers).  What it does have are millions of residential customers who use Cablevision as their Internet Service Provider ("ISP"), and who have already paid Cablevision to set up wireless networks in their homes. Cablevision realized that it could turn the equipment it leases to each of those customers into a *public* wireless hotspot, allowing *additional* consumers to piggyback off of those customers' Wi-Fi networks, emanating from their homes.  In this manner, Cablevision would be able to create a network of Wi-Fi signals and externalize much of the capital and operating costs.

15) At some point within the last several years, in the course of providing its residential Internet services, Cablevision has been supplying new and existing customers with wireless routers that create both a Wi-Fi network in the customer's home and an *additional, public* Wi-Fi network, over which the customer has no control, that is accessible to anyone within the network's range.  Upon information and belief, these secondary, public Wi-Fi networks ("Optimum Wi-Fi Hotspots") being broadcast from consumers' homes are named "optimumwifi."[2]

16) However, Cablevision never obtained authorization from its customers to use the customers' household routers to broadcast additional Wi-Fi hotspots that are available to the public.

17) As a result of this unauthorized use, Cablevision is (1) externalizing its costs for this project onto its customers; (2) compromising the speed of the customers' Internet access; and (3) subjecting its customers to increased security risks.

---

[2] Wi-Fi networks are typically named, so that parties can know which network they're connecting to. Upon information and belief, each of the Optimum Wi-Fi Hotspots bear the same name of "optimumwifi."

CLASS ACTION COMPLAINT

**B.** **Cablevision's Practices Result in Higher Electricity Costs, A Slower Internet Connection, And Increased Security Vulnerabilities For Cablevision Customers**

18)     Without authorization to do so, Cablevision uses the wireless routers it leases to its customers to generate additional, public Wi-Fi networks for its own benefit.  One side effect of this practice is that these wireless routers use more electricity than would a regular router generating only a single Wi-Fi network for the customer's benefit.  This additional electricity usage is a cost born by the unwitting customer.

19)     Specifically, engineers at Speedify, a technology company offering services to increase customers' Internet connection speeds, have run tests on routers supplied to residential customers, which broadcast secondary Wi-Fi networks – exactly like those Cablevision supplies to its customers to establish its Optimum Wi-Fi Hotspots.[3]  The purpose of the tests was to determine whether such equipment used more electricity than comparable equipment that was *not* emitting a second Wi-Fi network.

20)     The test established that such devices *do* use more electricity than routers that only emit one Wi-Fi network, even if no one ever connects to the second Wi-Fi network, and thus the engineers concluded that companies engaging in such practices externalize millions of dollars in costs onto their unsuspecting customers in order to establish these Wi-Fi networks.[4]

21)     If a consumer leases a Cablevision-supplied wireless router that enables an Optimum Wi-Fi Hotspot, he or she can expect additional electricity costs even if *no one uses the hotspot*.  If, however, someone *does* use the Optimum Wi-Fi Hotspot, be it a guest of the customer or a complete stranger sitting outside the customer's residence, then the electricity

---

[3] It should be noted that the Speedify study looked at routers supplied by Comcast, and not Cablevision.  However, the specific issue analyzed was whether the broadcasting of a second Wi-Fi network increased electricity usage—activity that is as common to Cablevision's routers as it is to Comcast's.

[4] Alex Gizis, "Is Your Comcast Public Hotspot Costing You Real Money?" Speedify (Jun. 26, 2014) (available at http://speedify.com/%20blog/comcast-public-hotspot-cost/); *see follow up study results at* Raj Haldar, "Is There A Hidden Cost To Your Xfinity Router?" Speedify (Aug. 7, 2014) (available at http://speedify.com/blog/hidden-cost-xfinity-router-2/).

costs increase substantially.[5]

22)     Also, upon information and belief, the Optimum Wi-Fi Hotspot slows down the speed of the customer's non-public, home Wi-Fi network.  As one commentator notes, the spectrum upon which a Wi-Fi network operates is a limited resource, and increased network traffic – including traffic you cannot control – will affect your access to that resource: "There's limited bandwidth to your device and, on the larger scale, your neighborhood. With enough guests in a concentrated area, it will absolutely affect your connectivity… it may even destroy it."[6]

23)     Another commentator further explains:

> This may be a legitimate concern, especially for areas that have lots of apartment buildings and multi-tenant dwellings within close proximity of one another. In my building, just about every apartment has a Wi-Fi router. Those routers are transmitting on the same channels for their 2.4GHz and 5GHz signals, leading to RF competition. Now, if you take that scenario and give everyone in that apartment another wireless network to broadcast, those networks are competing, too, and adding to interference.[7]

24)     Additionally, upon information and belief, the Optimum Wi-Fi Hotspot exposes Cablevision's customers to increased privacy and security risks.

25)     Since Cablevision uses the Optimum Wi-Fi Hotspot to allow strangers to connect to the Internet through the same wireless router used by Cablevision customers in their homes, the data and information on a Cablevision customer's network is at greater risk.

26)     The customer is never asked for authorization by Cablevision to let it use his or her router to create public Wi-Fi networks; but through Cablevision's unauthorized use, anyone may connect to the customer's wireless router, without that customer's authorization and without that customer's control, for any purpose.

27)     Cablevision configures the routers it leases to consumers so that the Optimum Wi-

---

[5] *Id.*
[6] Josh Carr, "Disable Comcast Xfinity WiFi Hotspot: A How-To-Guide." Fix Denver (Jun. 13, 2014) (available at https://fixdenver.com/blog/guides/disable-comcast-xfinity-wifi-hotspot/).
[7] Samara Lynn, "4 Concerns About Comcast's Xfinity Wi-Fi Hotspot Rollout." PC Magazine (Jun. 11, 2014) (available at http://www.pcmag.com/article2/0,2817,2459357,00.asp).

CLASS ACTION COMPLAINT

Fi Hotspot cannot be disabled. Thus, consumers wishing to opt out of broadcasting a secondary Wi-Fi network from their homes are left with no recourse other than to buy an entirely new wireless router, costing anywhere from $50 to $200.

C.   **Cablevision's Failure to Obtain Class Members' Authorization for Its Use of Their Internet Service**

28)   Cablevision does not obtain authorization from its customers to use their routers to generate an Optimum Wi-Fi Hotspot; rather, Cablevision simply uses its customers' Internet access, equipment, and resources for its own benefit and to its customers' detriment, without any authorization.

29)   Further, Cablevision does not even make its customers *aware* that, by contracting with Cablevision for Internet access, the wireless routers they lease from the Company to establish their own Wi-Fi network will concurrently be used as part of Cablevision's network of publicly accessible Optimum Wi-Fi Hotspots. Cablevision's contract with its customers fails to address the practice *at all*, much less adequately enough to be said to have obtained its customers' authorization of this practice.

i.   **Cablevision's Contract With Its Residential Customers**

30)   A party may sign up for the Optimum Online Service via Cablevision's Optimum-branded website or by calling Cablevision. In either instance, the party provides Cablevision with preliminary information – the type of service requested and the address for which such service is being requested – and an installation appointment is set up.

31)   At no point during the online sign-up process does the prospective consumer agree to be bound by any terms or conditions in relation to the Optimum Online Service. Indeed, during this process, the prospective customer is never directed to any terms or conditions related to the Optimum Online Service.

32)   Subsequently, upon installation, the customer is presented with a sales order, the back of which document is titled "GENERAL TERMS AND CONDITIONS OF SERVICE." A copy of such document, given to Plaintiff in the course of the installation of his Optimum Online

7

Service, is attached hereto as Exhibit A ("Customer Contract").

33)     At no point in the Customer Contract does Cablevision *mention* the existence of a secondary network being broadcast from the router it leases to the residential customer.  Because Cablevision does not even disclose the *existence* of its secondary Wi-Fi network, it cannot have obtained the authorization of its customers to such practices through its Customer Contract.

34)     Further, while the Customer Contract purports to incorporate additional terms and conditions, it does so in a manner that is vague and fails to alert a reasonable customer as to what precise terms are intended to be incorporated.  Specifically, the Customer Contract states, in pertinent part:

> In addition to these General Terms and Conditions of Service, Subscriber agrees to be bound by the terms of service for the applicable Optimum service as set forth at www.optimum.net, such as Optimum TV, Optimum Online and Optimum Voice, as well as the Cablevision Customer Privacy Notice, as such may be updated from time to time (collectively, the "Terms of Service"), which are incorporated herein by this reference.  In the event of any conflict between these Terms and Conditions below and the Terms of Service, the Terms of Service shall control.

Ex. A at p. 2.

35)     Cablevision's attempt at such broad incorporation fails to put a consumer on legal notice of the actual terms that Cablevision proposes to incorporate into the Consumer Contract. Indeed, a visit to the URL www.optimum.net referenced in the Consumer Contract fails to show any terms of service.  Instead, this is merely the homepage for Cablevision.  A visitor is greeted with prompts to log into the website via a customer ID, to pay one's bill, and to seek customer support.  Scrolling down, a visitor is presented with the current temperature in Manhattan and several news headlines, and a map of Optimum Hotspots.  At the bottom of the page is an inconspicuous bank of additional hyperlinks written in small font: "GoToAssist," "Service Terms & Info," "Copyright Policy," "Privacy Notice," "Report Abuse," "Accessibility," "Storm Preparedness," and "Join Our Customer Panel."   A screen grab of the above (www.optimum.net), gathered on June 26, 2015 from 4:27 pm, CDT to 4:33 pm, CDT is

8

attached hereto as Exhibit B.

36)     Even if a consumer goes to www.optimum.net, scrolls to the bottom of the page, finds the hyperlinks, and discerns that the hyperlink marked "Service Terms & Info" is meant to link to the terms and conditions Cablevision proposes to incorporate into the Customer Contract, upon clicking on that link the customer is then taken to a new webpage – www.optimum.net/pages.terms.html – which contains *another* set of links to *twenty-two* different terms of service, which bear no relation to each other.

37)     It is only if the customer then clicks on the fourth link – "Residential" – that he or she is directed to a web page titled "Optimum Online Residential Terms of Service – Agreement for Optimum Online"[8]  There, in the last paragraph (paragraph 42), titled "Additional Terms for Optimum-provided Wireless Router and Wireless Access Point," the existence of the Optimum Wi-Fi Hotspot is referenced as follows: "The Optimum Router is preconfigured to distribute a second wireless network (i.e. an Optimum WiFi Hotspot) in addition to the Home Network. This Optimum WiFi Hotspot is separate from the Home Network and is accessible by certain authorized Optimum WiFi users."

38)     Accordingly, to the extent that Cablevision purports to obtain a customer's authorization to the practices challenged herein via incorporation by reference of provisions on its website or via any source other than the language contained within the Customer Contract, it fails to do so.  Thus, Cablevision never obtains its customers' authorization for its use of their routers to broadcast public Optimum Wi-Fi Hotspots.

## H.     Factual Allegations As To Plaintiff

39)     Plaintiff contracted with Cablevision for the Optimum Online Service.  As a part of such services, Plaintiff paid Cablevision to lease equipment to connect to the Internet, including a wireless router that was, unbeknownst to Plaintiff, equipped to broadcast an Optimum Wi-Fi Hotspot in addition to Plaintiff' personal, home Wi-Fi hotspot.

---

[8] available at https://www.optimum.net/pages/Terms/Internet/Residential.html

CLASS ACTION COMPLAINT

40)     Plaintiff did not authorize Cablevision to use his wireless router to create a separate, publicly accessible Optimum Wi-Fi Hotspot.

41)     Once Plaintiff learned of the existence of the Optimum Wi-Fi Hotspot, he promptly contacted Cablevision and asked that the Optimum Wi-Fi Hotspot be turned off.  He was informed that it could not be, and that if he did not wish for his home router to broadcast a secondary Wi-Fi signal that was available to the public, he would have to purchase a separate router, at his own expense, rather than the leased router supplied as part of his subscription plan.

42)     As a result of Cablevision's unauthorized use of Plaintiff's router complained of herein, Plaintiff has been forced to incur additional expenses in the form of increased electricity bills.

43)     As a result of Cablevision's unauthorized use of Plaintiff's router complained of herein, Plaintiff has suffered injury in the form of decreased, inadequate speeds on his home Wi-Fi network.

44)     As a result of Cablevision's unauthorized use of Plaintiff's router complained of herein, Plaintiff has had his wireless router exposed to possible, additional use by unknown third parties, with neither Plaintiff's knowledge nor Plaintiff's authorization.

## V.     CLASS ACTION ALLEGATIONS

### A.     Class Definition

45)     Plaintiff bring this action, individually and on behalf all others similarly situated pursuant to Federal Rule of Civil Procedure 23, and seeks certification for the following Class and New York Subclass (collectively, "Class"):

> **Optimum Subscriber Class:** All people that have subscribed to Cablevision's Optimum Online Service and who, as a result, have leased wireless routers that broadcast an Optimum Wi-Fi Hotspot.

> **New York Optimum Subscriber Subclass:** All people in New York who have subscribed to Cablevision's Optimum Online

Service and who, as a result, have leased wireless routers that broadcast an Optimum Wi-Fi Hotspot.

46)     The Class does not include Cablevision, or its officers, directors, agents, or employees.

47)     Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

48)     This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23.

## FRCP 23(a) Factors

49)     **Numerosity:** The Class comprises hundreds of thousands of persons throughout the State of New York, alone, and over one million people throughout the Cablevision's larger territory of New York, New Jersey, Connecticut, and Pennsylvania ("Cablevision's Territory"). Upon information and belief, over one million Optimum Wi-Fi Hotspots were active as of the end of 2014. Therefore, the class is so numerous that joinder of all members is impracticable and the disposition of their claims in a Class Action will benefit the parties and the Court.

50)     **Commonality:** The questions of law and fact common to the Class have the capacity to generate common answers that will drive resolution of this action. Common questions of law and fact include, but are not limited to, the following:

a)   Whether Defendant's Customer Contract obtains authorization for Defendant to use customers' wireless routers to create separate, publicly accessible Optimum Wi-Fi Hotspots;

b)    Whether Defendant's conduct violates the Computer Fraud and Abuse Act (18 U.S.C. § 1030);

c)   Whether Defendant's conduct violates N.Y. Gen. Bus. Law § 349;

d)   Whether Defendant's conduct constitutes trespass to chattels; and

e)   Whether Defendant has been unjustly enriched by its conduct.

51)    **Typicality:** Plaintiff's claims and Defendant's defenses thereto, are typical of the claims of the proposed Class, as the direct violations of the Computer Fraud Abuse Act and N.Y. Gen. Bus. Law § 349, as well as the acts of trespass to chattels and unjust enrichment, are consistent and uniform and affect every member of the Class in the same way.  Additionally, all members of the proposed Class have the same or similar injury (loss of fees paid, increased electricity costs, slower Internet connections, and compromised network security) based upon Cablevision's unlawful conduct.

52)    **Adequacy:** Plaintiff does not have any conflicts with any other members of the proposed Class, and will fairly and adequately represent and protect the interests of the proposed Class.   Plaintiff has retained competent and experienced counsel in class action and other complex litigation.

### FRCP 23(b)(2)

53)    Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual member of the Class that would establish incompatible standards of conduct for Defendant.

54)    Injunctive relief is necessary to prevent further unlawful and unfair business practices by Defendant.  Money damages alone will not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its illegal and unfair policies.

### FRCP 23(b)(3)

55)    **Common Issues Predominate:** As set forth in detail herein, common issues of fact and law predominate because all of Plaintiff's claims are based on the same conduct. Whether Defendant's conduct violates the Computer Fraud and Abuse Act and N.Y. Gen. Bus. Law § 349, and amount to acts of trespass to chattels and unjust enrichment, are a set of issues common to all members of the Class and are the predominate issues.  Plaintiff can prove the

elements of those claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

56)     **Superiority:**  A class action is superior to other available methods for fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for Class members to prosecute their claims individually. Absent a class action, Defendant will likely retain the benefits of its wrongdoing.  Because of the small size of an individual Class member's claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.  Absent a representative action, the Class members will continue to suffer losses and Defendant will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

57)     The trial and litigation of Plaintiff's claims are manageable.  Individual litigation of the legal and factual issues raised by Defendant's conduct would increase delay and expense to all parties and the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

58)     **Notice to the Class:** Notice can be accomplished by direct notice to class members because Defendant has each customer's information in its contractual records.

## VI.     CAUSES OF ACTION

### COUNT I
### Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030)
### (Brought on behalf of the Class)

59)     Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

60)     Plaintiff, individually and on behalf of Class members, asserts violations of 18 U.S.C. § 1030 for Cablevision's unlawful and unauthorized access of Plaintiff's and Class members' wireless routers, for purposes of establishing Optimum Wi-Fi Hotspots, thereby resulting in damage and loss.

61)     Plaintiff and Class members are "persons" pursuant to 18 U.S.C. § 1030(e)(12)

13

("any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity.").

62)     Plaintiff's and Class members' wireless routers are "computers" pursuant to 18 U.S.C. § 1030(e)(1) ("an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions,…include[ing] any data storage facility or communications facility directly related to or operating in conjunction with such device").

63)     Plaintiff's and Class members' wireless routers are "protected computers" pursuant to 18 U.S.C. § 1030(e)(2)(B) ("a computer…which is used in or affecting interstate or foreign commerce or communication").

64)     Defendant's acts complained of herein "exceed authorized access" pursuant to 18 U.S.C. § 1030(e)(6) ("to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter").

65)     Defendant's acts complained of herein have caused "damage" to Plaintiff's and Class members' wireless routers pursuant to 18 U.S.C. § 1030(e)(8) ("any impairment to the integrity or availability of data, a program, a system, or information").

66)     Plaintiff and Class members have experienced "loss" pursuant to 18 U.S.C. § 1030(e)(11) ("any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service").

67)     Throughout the entirety of the conduct upon which this suit is based, Cablevision's actions have affected interstate commerce as evidenced by, *inter alia*, the multi-state scope of Cablevision's Optimum Wi-Fi Hotspot network, the multi-state scope of Cablevision's subscriber base, and the national and international impact on commerce that Internet connectivity generally facilitates.

68)     Cablevision's actions are and have been knowing as evidenced by, *inter alia*, its

14

CLASS ACTION COMPLAINT

dissemination of wireless routers capable of broadcasting Optimum Wi-Fi Hotspots and its implementation of code that enables the activation of those Optimum Wi-Fi Hotspots.

69)    In violation of 18 U.S.C. § 1030(a)(5)(A), Cablevision knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization to the protected computers of Plaintiff and Class members.  Specifically, Cablevision made the wireless routers it provided to Plaintiff and Class members capable of receiving a command to generate public Wi-Fi signals, in the form of Optimum Wi-Fi Hotspots, that are additional to Plaintiff's and Class members' home network Wi-Fi signals.  Cablevision never obtained authorization from Plaintiff or Class members to execute such a command and to thereby cause Plaintiff's and Class members' wireless routers – protected computers pursuant to 18 U.S.C. § 1030(e)(2)(B) – to broadcast Optimum Wi-Fi Hotspots.  Such practice – unauthorized by Plaintiff and Class members – caused damage to the wireless routers at issue in the form of, *inter alia*, increased and unnecessary electricity usage.  Such damage has resulted in an aggregated loss, as defined in 18 U.S.C. § 1030(e)(11), in of more than $5,000 within the year preceding the date of this filing.

70)    In violation of 18 U.S.C. § 1030(a)(5)(B), Cablevision intentionally accessed the protected computers of Plaintiff and Class members, and as a result of such conduct, recklessly caused damage.  Specifically, Cablevision made the wireless routers it provided to Plaintiff and Class members capable of receiving a command to generate public Wi-Fi signals, in the form of Optimum Wi-Fi Hotspots that are additional to Plaintiff's and Class members' home network Wi-Fi signals.  Cablevision never obtained authorization from Plaintiff or Class members to execute such a command and to thereby cause Plaintiff' and Class members' wireless routers – protected computers pursuant to 18 U.S.C. § 1030(e)(2)(B) – to broadcast Optimum Wi-Fi Hotspots.   Cablevision intentionally executed such command in order to access, without authorization, the wireless routers of Plaintiff and Class members, and as a result recklessly caused damage to the wireless routers at issue in the form of, *inter alia*, increased and unnecessary electricity usage.  Such damage has resulted in an aggregated loss, as defined in 18

U.S.C. § 1030(e)(11), in of more than $5,000 within the year preceding the date of this filing.

71)     In violation of 18 U.S.C. § 1030(a)(5)(C), Cablevision intentionally accessed the protected computers of Plaintiff and Class members, and as a result of such conduct, caused damage and loss.  Specifically, Cablevision made the wireless routers it supplied to Plaintiff and Class members capable of receiving a command to generate public Wi-Fi signals, in the form of Optimum Wi-Fi Hotspots that are additional to Plaintiff's and Class members' home network Wi-Fi signals.  Cablevision never obtained authorization from Plaintiff or Class members to execute such a command and to thereby cause Plaintiff's and Class members' wireless routers – protected computers pursuant to 18 U.S.C. § 1030(e)(2)(B) – to broadcast Optimum Wi-Fi Hotspots.  Cablevision intentionally executed such command in order to access, without authorization, the wireless routers of Plaintiff and Class Members, and as a result recklessly caused damage to the wireless routers at issue in the form of, *inter alia*, increased and unnecessary electricity usage.  Such damage has resulted in an aggregated loss, as defined in 18 U.S.C. § 1030(e)(11), of more than $5,000 within the year preceding the date of this filing.

72)     Plaintiff and Class members are afforded a private cause of action against Cablevision pursuant to 18 U.S.C. §§ 1030(g) and 1030(c)(4)(A)(i)(I).

73)     Pursuant to 18 U.S.C. § 1030(g), Plaintiff and Class Members are entitled to compensatory damages, injunctive relief, and all other equitable relief available.

## COUNT II
### Trespass to Chattels
### (Brought on behalf of the Class)

74)     Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

75)     By engaging in the acts alleged in this Complaint, Defendant intentionally, and without authorization or justification, physically interfered with the use and enjoyment of property in possession and control of Plaintiff and Class members, thereby causing them harm.

76)     At all times relevant to the instant litigation, Plaintiff and Class members have

been possessors of the wireless routers supplied by Defendant as part of the Optimum Online Service.

77)     Defendant dispossessed Plaintiff and Class members of the full and unfettered use of these wireless routers for a substantial time by commandeering the resources of the routers and broadcasting the Optimum Wi-Fi Hotspot, for Defendant's own purposes, thereby injuring Plaintiff and Class members by (1) externalizing electricity costs onto Plaintiff and Class members; (2) degrading the speed and quality of the Optimum Online Service; and (3) increasing security risks posed to Plaintiff and Class members.

78)     Defendant impaired the condition, quality, and value of the wireless routers it supplied to Plaintiff and Class members as part of the Optimum Online Service, via the broadcasting of Optimum Wi-Fi Hotspots from said routers, which constitutes an ongoing alteration to the wireless routers of Plaintiffs and Class members, which alteration Defendant was not entitled to make.

79)     Plaintiff and Class members have had, at all times relevant to this litigation, a legally protected interest in the wireless routers at issue, protecting them from, *inter alia*, (1) needless externalization of electricity costs; (2) degradation of the functionality of the routers; and (3) compromise of the routers' security.

80)     Defendant engaged in acts of deception and concealment in order to broadcast the Optimum Wi-Fi Hotspot from the routers of Plaintiff and Class members.

81)     Defendant's acts and practices – impairing the condition, quality, and value of the wireless routers supplied to Plaintiff and Class members – was done without the authorization of Plaintiff and Class members.

82)     Defendant's acts and practices – impairing the condition, quality, and value of the wireless routers supplied to Plaintiff and Class members – caused real and substantial damage to Plaintiff and Class members.

83)     Plaintiff, individually and on behalf of the Class, seeks injunctive relief restraining Defendant from broadcasting, without authorization, the Optimum Wi-Fi Hotspot

from the wireless routers of Plaintiff and Class members, and enjoining Defendant from supplying wireless routers in which the Optimum Wi-Fi Hotspot is incapable of being disabled. Plaintiff additionally seeks damages individually and on behalf of the Class.

## COUNT III
### Unjust Enrichment
### (Brought on behalf of the Class)

84)    Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

85)    Plaintiff and all other Class members conferred benefits on Defendant by paying for the Optimum Online Service.

86)    Defendant knowingly and willfully accepted monetary payment from Plaintiff and Class members in return for providing the Optimum Online Service. In so doing, Defendant also provided leased wireless routers to Plaintiff and Class members, knowing (1) that such routers would broadcast the Optimum Wi-Fi Hotspot; (2) that Plaintiff and Class members had not authorized the broadcasting of the Optimum Wi-Fi Hotspot from their home routers; and (3) that Plaintiff and Class members could not deactivate the Optimum Wi-Fi Hotspot.

87)    Under the circumstances described herein, it is inequitable for Defendant to retain the monetary benefits derived from Plaintiff and Class members.

88)    By engaging in the conduct described above, Defendant has been unjustly enriched at the expense of Plaintiff and Class members.  Accordingly, it would be contrary to principles of equity and good conscience to permit Defendant to retain any ill-gotten monetary benefits obtained as a result of the actions described herein.

89)    As a result of Defendant's unjust enrichment, Plaintiff and the Class members have suffered injury and are entitled to reimbursement, restitution, and disgorgement by Defendant of the benefit conferred by Plaintiff and Class members.

## COUNT IV
### Violation of N.Y. General Business Law § 349
### (Brought on behalf of the Subclass)

90)     Plaintiff adopts and incorporates each and every allegation of this complaint as if stated fully herein.

91)     Plaintiff, individually and on behalf of Class members, asserts violations of N.Y. Gen. Bus. Law § 349 for Cablevision's unlawful and unauthorized access of Plaintiff's and Class members' wireless routers, for purposes of establishing Optimum Wi-Fi Hotspots, thereby resulting in damage and loss.

92)     In the course of providing the Optimum Online Service to residential customers – including Plaintiff and members of the Class – Defendant provided wireless routers that surreptitiously broadcast a secondary Wi-Fi network, available to the public, for the benefit of Defendant and to the detriment of Plaintiff and Class members.  At no point did Defendant obtain the authorization of Plaintiff or Class members to broadcast the Optimum Wi-Fi Hotspots from their collective residences.

93)     As a result, Plaintiff and Class members have suffered harm in the form of (1) increased electricity costs; (2) decreased performance on their home Wi-Fi networks; and (3) increased security risks to their home Wi-Fi networks.

94)     Defendant's violations of N.Y. Gen. Bus. Law § 349 have at all times been knowing and willful. This is evidenced by, *inter alia*, Defendant's dissemination of wireless routers capable of broadcasting Optimum Wi-Fi Hotspots and its implementation of code that enables the activation of those Optimum Wi-Fi Hotspots.

95)     As a result of Defendant's violations of N.Y. Gen. Bus. Law § 349, Plaintiff and each member of the Class are entitled to injunctive relief, attorney's fees, statutory damages of $50, and trebled actual damages not to exceed $1,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment in favor of himself and the Class for the following:

A.      That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure; that Plaintiff is a proper class representative; that the best practicable notice of this action be given to members of the Class represented by Plaintiff; and that Plaintiff's counsel be appointed as Class counsel;

B.      That judgment be entered against Defendant and in favor of Plaintiff and the Class on the Causes of Action in this Complaint;

C.      That judgment be entered against Defendant for restitution; compensatory damages in an amount to be determined at trial; statutory damages; and injunctive and equitable relief, including, but not limited to, enjoining Defendant from using residential customers' wireless routers to create Optimum Wi-Fi Hotspots without first obtaining authorization;

D.      That judgment be entered against Defendant imposing interest on damages;

E.      That judgment be entered against Defendant imposing litigation costs and attorneys' fees; and

F.      For all other and further relief as this Court may deem necessary and appropriate.

Plaintiff demands a jury trial on all issues so triable.

DATED: July 16, 2015                         Respectfully submitted,

                                             By:     */s/ Hank Bates*
                                             **CARNEY BATES & PULLIAM, PLLC**
                                             Joseph H. "Hank" Bates
                                             hbates@cbplaw.com
                                             2800 Cantrell Rd., Suite 510
                                             Little Rock, Arkansas 72202
                                             Telephone:   (501) 312-8500
                                             Facsimile:   (501) 312-8505

                                             (*to apply for application to appear pro hac vice*)

CLASS ACTION COMPLAINT

**KU & MUSSMAN, P.A.**
Brian T. Ku
brian@kumussman.com
Louis I. Mussman
louis@kumussman.com
M. Ryan Casey
ryan@kumussman.com
6001 NW 153rd St., Suite 100
Miami Lakes, Florida 33014
Telephone:   (305) 891-1322
Facsimile:   (305) 891-4512

**MILSTEIN ADELMAN, LLP**
Gillian L. Wade, CA Bar No. 229124
gwade@milsteinadelman.com
Sara D. Avila, CA Bar No. 263213
savila@milsteinadelman.com
2800 Donald Douglas Loop North
Santa Monica, California 90405
Telephone:   (310) 396-9600
Fax:   (310) 396-9635

(*to apply for application to appear pro hac vice*)

CLASS ACTION COMPLAINT